**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


**JAMES ARMANDO CARD,**

        **Petitioner,**

**v.**                          **CASE NO.  4:08-cv-448-SPM**
                                    **CAPITAL CASE**

**WALTER A. McNEIL,**
**Secretary, Fla. Dept. of Corrections, et al.,**

        **Respondents.**

_____/

### ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

      **THIS CAUSE** is before the court on a petition for a writ of habeas corpus filed by James Armando Card, a Florida death row inmate, pursuant to Title 28, United States Code, Section 2254 (doc. 1).   Petitioner asserted two claims for relief. Respondents filed a motion to dismiss Claim I of the petition (doc. 9 at 54-68), and an order dismissing Claim I was entered on January 26, 2009 (doc. 11). After careful consideration of the remaining issue raised in the pleadings and for the reasons stated below, the petition is denied.

### I.  FACTS & PROCEDURAL HISTORY

      The relevant facts and lengthy procedural history are set out as follows in the Florida Supreme Court's opinion affirming Petitioner's sentence after a new penalty phase was conducted:

> Card, who was thirty-four years old at the time of the crimes, was convicted of first-degree murder, robbery, and kidnapping and was sentenced to death. This court affirmed. However, in postconviction proceedings, the trial court vacated his sentence of death after an evidentiary hearing based on an improper procedure used in permitting the State to prepare the original sentencing order.FN1 After a new

penalty phase hearing before a new jury, the trial court imposed the death penalty.

> FN1. The complete procedural history of this case is as follows: This Court affirmed the convictions and sentences on direct appeal. *See Card v. State*, 453 So.2d 17, 18 (Fla.1984). Thereafter, Card filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 which the trial court denied. Card then filed a petition for writ of habeas corpus in this Court and sought a stay of execution. Although this Court initially granted the stay of execution, this Court subsequently affirmed the trial court's denial of the postconviction motion, dissolved the stay of execution, and denied habeas relief. *See Card v. State*, 497 So.2d 1169, 1177 (Fla.1986). Card filed a second petition for extraordinary relief, writ of habeas corpus, and stay of execution, and this Court denied relief in *Card v. Dugger*, 512 So.2d 829, 831 (Fla.1987). Card filed a second motion for postconviction relief, which the trial court summarily denied. *See Card v. State*, 652 So.2d 344, 344 (Fla.1995). In Card's subsequent appeal of the trial court's denial of his 3.850 motion, this Court reversed the summary denial of Card's claim that the trial judge improperly abdicated its sentencing responsibility to the prosecution and remanded for an evidentiary hearing on that issue alone. *See id.* at 345-46. After conducting an evidentiary hearing, the trial court vacated Card's death sentence. The trial court then reimposed the death sentence after a new penalty phase. This appeal followed.

On Card's direct appeal, the Court related the following material facts:

> On the afternoon of June 3, 1981, the Panama City Western Union office was robbed of approximately $1,100. Blood was found in the office and the clerk, Janis Franklin, was missing. The following day, Mrs. Franklin's body was discovered beside a dirt road in a secluded area approximately eight miles from the Western Union office. Her blouse was torn, her fingers severely cut to the point of being almost severed and her throat had been cut.

> As early as 6:30 on the morning of June 3, 1981, the

appellant telephoned an acquaintance, Vicky Elrod, in Pensacola, Florida, and told her that he might be coming to see her to repay the $50 or $60 he owed her. At approximately 9:30 that night Vicky Elrod met with the appellant. He took out a stack of twenty and one-hundred dollar bills and she asked if he had robbed a 7 Eleven store. He told her that he had robbed a Western Union station and killed the lady who worked there. He described scuffling with the victim, tearing her blouse and cutting her with his knife. He said he then took her in his car to a wooded area and cut her throat saying, "Die, die, die." Several days after their meeting, Vicky Elrod went to the police with this information. The appellant was then arrested.

*Card v. State*, 453 So.2d 17, 18-19 (Fla.1984). The testimony at the resentencing proceeding established these same facts.

Additionally at the resentencing proceeding, the prior testimony of the medical examiner, Dr. Edmund Kielman, who had performed the autopsy of Franklin, was read to the jury.FN2 According to Dr. Kielman's prior testimony, the victim suffered several defensive wounds and had a "very deep cut over her throat." The medical examiner stated that the wound to the victim's throat was approximately six or seven inches in length. The wound was also approximately two-and-one-half inches deep and almost went to the spinal cord. He opined that the perpetrator must have used a considerable amount of force in inflicting the wound to the victim's throat and that the instrument utilized by the perpetrator had to be fairly sharp to go that deep. The medical examiner also observed that the victim had suffered extensive wounds to her hands. The medical expert testified that these were classic defense wounds caused by the person protecting himself or herself from an attack.

> FN2. Doctor Edmund Kielman died before the resentencing proceedings.

In Card's defense, Card's attorney presented the testimony of several members of Card's family, including his mother, brother-in-law, ex-wife, daughter, niece, and brother. They testified about, among other things, Card's difficult childhood, his unstable family environment, his military service, and his achievements in prison. Defense counsel also

presented the testimony of a Catholic priest, the director of a Catholic charity, and a Catholic sister. They testified about Card's religious beliefs, his commitment to Catholicism, his artwork, and how Card began writing to school children while in prison in an effort to deter young children from crime.

Defense counsel also presented the testimony of a professor of psychology at the University of Santa Cruz, Dr. Craig Haney, who testified about how he analyzed and evaluated Card's social history in an effort to understand or explain Card's criminal behavior. Doctor Haney opined that given Card's background, which included growing up in poverty, being abandoned by his father prior to birth, and suffering physical and emotional abuse and parental neglect, it was predictable that Card would use drugs and alcohol and engage in behavior that would lead him to prison. Doctor Haney also testified that Card had a good prison record and that, despite Card's past, he had adjusted well to prison life.

At the conclusion of the resentencing proceedings, the jury recommended the death penalty by a vote of eleven to one. In imposing the death penalty, the trial court found five aggravating factors: (1) the murder was committed while the defendant was engaged in the commission of a kidnapping; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest; (3) the murder was committed for pecuniary gain; (4) the murder was especially heinous, atrocious, or cruel ("HAC"); and (5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification ("CCP"). The trial court found no statutory mitigating factors, but did find seven nonstatutory mitigators: (1) Card's upbringing was "harsh and brutal" and his family background included an abusive stepfather (some weight); (2) Card has a good prison record (slight weight); (3) Card is a practicing Catholic and made efforts for other inmates to obtain religious services (some weight); (4) Card was abused as a child (some weight); (5) Card served in the Army National Guard and received an honorable discharge (some weight); (6) Card has artistic ability (little weight); and (7) Card has corresponded with school children to deter them from being involved in crime (some weight). The trial court found that the aggravating circumstances outweighed the mitigating circumstances and imposed a death sentence.

*Card v. State*, 803 So.2d 613, 617-19 (Fla. 2001) cert. denied, 536 U.S. 963, 122 S. Ct.

2673, 153 L. Ed.2d 845 (2002)("*Card I*").[1]  Petitioner appealed the death sentence he received after the new penalty phase proceeding, raising twelve claims for relief.[2] The Florida Supreme Court found no error and affirmed Petitioner's sentence of death.  *See Card I*.  Petitioner thereafter filed a motion for postconviction relief under Fla. Rule of Criminal Procedure 3.851, raising an ineffective assistance of counsel claim. After an evidentiary hearing, the postconviction court denied relief, and the Florida Supreme Court affirmed this denial.  *See Card v. State*, 992 So.2d 810 (Fla. 2008)(per curiam)("*Card II*").

Petitioner filed the instant petition on October 14, 2008.  Doc. 1.  The petition is now ripe for adjudication.

## II.  EVIDENTIARY HEARING

Petitioner requests a plenary evidentiary hearing on the claim presented in his petition.[3]  Doc. 1 at 2.  Title 28 of the United States Code, Section  2254 provides for an evidentiary hearing in federal habeas claims under very limited circumstances:

> **(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing**

---

[1]Petitioner also filed a petition for a writ of habeas corpus in federal court based on issues related to his original trial proceedings.  He was ultimately denied habeas relief.  *See Card v. Dugger,* 911 F.2d 1494 (11th Cir. 1990) and *Card v. Singletary*, 981 F.2d 481 (11th Cir.1992).

[2]Petitioner raised the following claims: (1) the State's penalty phase closing argument was fundamentally unfair; (2) the trial judge erred in not recusing herself; (3) the trial judge erred in finding and instructing the jury on four of the five aggravating circumstances; (4) the trial judge erred in failing to find proposed mitigating evidence and in failing to explain her weighing process; (5) the death penalty is disproportionate; (6) the trial court erred in denying the defense's motion to require a unanimous verdict; (7) the trial court erred in denying his request to give jurors an alternative instruction pertaining to CCP; (8) the trial court erred in using the standard jury instructions that refer to the jury as advisory and refers to their verdict as a recommendation; (9) the trial court erred in not allowing defense counsel to question Petitioner's family members about the effect his execution would have on their lives; (10) the CCP, HAC, murder committed during the course of a felony, avoiding arrest, and pecuniary gain aggravators are unconstitutionally overbroad and vague; (11) the use of victim impact evidence violated his due process rights; and (12) the trial court erroneously precluded him from introducing evidence that he received life sentences for the robbery and kidnapping convictions.  *Card v. State*, 803 So.2d 613, 619 n.3 (Fla. 2001)("Card I").

[3]Petitioner was granted an evidentiary hearing in state court.

on the claim unless the applicant shows that--

> (A) the claim relies on--
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(2002). In *Schriro v. Landrigan*, 550 U.S. 465, 474-75, 127 S. Ct. 1933, 1940, 167 L. Ed. 2d 836 (2007), the Court explained:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. *See, e.g., Mayes v. Gibson*, 210 F.3d 1284, 1287 (C.A.10 2000). Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. *See id.*, at 1287-1288 ("Whether [an applicant's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]").
>
> * * * *
>
> This principle accords with AEDPA's acknowledged purpose of "reduc[ing] delays in the execution of state and federal criminal sentences." *Woodford v. Garceau*, 538 U.S. 202, 206, 123 S. Ct. 1398, 155 L.Ed.2d 363 (2003) (citing *Williams v. Taylor, supra*, [529 U.S. 362] at 386, 120 S. Ct. 1495 (opinion of STEVENS, J.) ("Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law")). If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts.

(footnote omitted). Petitioner has not presented nor proffered any evidence to this court which would necessitate an evidentiary hearing on the claim he has raised.

He has presented no factual allegations which, even taken as true, would entitle him to relief. *See Ojeda v. Sec.'y for Dep't. of Corr.,* 279 Fed. Appx. 953, 954 n.1 (11th Cir. 2008)(per curiam)(evidentiary hearing is unnecessary where trial transcripts sufficiently address an issue, and a hearing would not have added any new information*); Kelley v. Sec.'y for Dep't of Corr.*, 377 F.3d 1317, 1334-37 (11th Cir. 2004)(capital petitioner met none of the requirements contained in 28 U.S.C. § 2254(e)(2), thus district court abused discretion in granting evidentiary hearing); *Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002)(under Section 2254(e) a hearing is not warranted "if such a hearing would not assist in the resolution of [the] claim." (citation omitted)). Because Petitioner has not met the requirements for an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2), his request for an evidentiary hearing is denied.

### III. STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[4] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); *Ramdass v. Angelone*, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). The Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." *Neelley*

---

[4]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds* by *Parker v. Head*, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting *Williams*, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If, on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must proceed to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. *Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court

case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law may be found reasonable, and not warranting a writ, so long as the State court adjudication results in a "satisfactory conclusion." *Williams*, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum). When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g. Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); *Jones v. Walker*, 496 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of

the merits of the petitioner's claims. *See Panetti v. Quarterman*, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); *Jones*, 496 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). Finally, in the event that constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U. S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). The test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but are not entitled to habeas relief based on trial error unless they can establish 'actual prejudice.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U. S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946)).[5]

Within this framework, the court will review Petitioner's claim.

## IV. PETITIONER'S CLAIM

Claim II: Ineffective Assistance of Counsel

Petitioner alleges that he received ineffective assistance of counsel in violation of his Sixth Amendment rights because his trial counsel failed to properly investigate and present mitigating evidence in his new penalty phase proceeding. Specifically, Petitioner contends that there was evidence supporting the statutory mitigators of extreme mental or emotional disturbance and age, as well as other nonstatutory mitigators, which should have been presented in his penalty phase retrial. Doc. 1 at 36-51.

1. State Court Proceedings

Petitioner raised this issue in his postconviction proceeding, and the claim was denied by the postconviction court. The Florida Supreme Court affirmed the denial, holding as follows:

---

[5]This harmless error standard is also applicable to cases involving habeas challenges to death sentences. *See Calderon v. Coleman*, 525 U.S. 141, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998); *Duest v. Singletary*, 997 F.2d 1336 (11th Cir. 1993); *Hicks v. Head*, 333 F.3d 1280 (11th Cir. 2003).

In his only issue on appeal, Card asserts that his resentencing counsel provided ineffective assistance at the resentencing by failing to investigate and present mitigation evidence that would have supported two statutory mitigating circumstances, including extreme mental or emotional disturbance and age.FN5 Because this is a resentencing, Card's counsel had the benefit of reviewing the transcript from the first penalty phase, in which the trial court found no mitigation in sentencing Card to death. *See Henry v. State*, 862 So.2d 679, 686 (Fla.2003) (stating that counsel in a resentencing has the advantage of reviewing the strategy of the first penalty phase). In fact, counsel testified at the evidentiary hearing that he reviewed all of Card's records, the transcript and testimony from the first trial, and the report of the defense's former expert who testified at the 1981 penalty phase.

> FN5. Card also filed a notice of appeal concerning the trial court's denial of his motion for DNA testing. However, he failed to raise the issue in his brief and conceded at oral argument that he was abandoning the issue at this time. Accordingly, we do not address it.

At the first penalty phase, the court appointed several experts to determine Card's competency to stand trial. Dr. Cartwright, a psychologist, examined Card and determined that he had a full appreciation for the charges, that he was neither insane at the time of the crime nor at the time of the trial, and that he had average intellectual ability and demonstrated *antisocial personality disorder*. Dr. Berland, a psychologist, met with Card and agreed that he was competent to stand trial and was not insane. The court also appointed Dr. Wray, a forensic psychiatrist, to examine Card for competency as well as to assist the defense with mental mitigation. Dr. Wray submitted several letters to the court regarding his evaluations, first concluding that Card had an IQ between 130 and 135, was not psychotic, although he may have had psychotic delusions, and that he needed further evaluation because there was a possibility of insanity. Dr. Wray's final report concluded that there was no indication of statutory mitigation, such as extreme mental or emotional disturbance at the time of the crime, no evidence of paranoid *schizophrenia*, and that Card essentially had *antisocial personality disorder*.

The defense also had hired another expert, Dr. Hord, to assist with possible mitigation. Dr. Hord, a clinical psychologist who evaluated Card on several occasions, was the only defense witness who testified at the initial penalty phase. Dr. Hord testified that Card had sociopathic

personality adjustment pattern (not psychotic), he reacted poorly to stress, at the time of the murder "his mental state ... was extreme [ ] mental or emotional disturbance," and he had no capacity to appreciate the criminality of the conduct, but that he was both sane and rational at the time of the murder. Dr. Hord also detailed Card's poor childhood and how it created his sociopathic tendencies and testified that Card could adjust well to prison life.

At the first penalty phase, the defense presented no lay witnesses or additional testimony beyond that of Dr. Hord. The trial court, following the jury's seven-to-five death recommendation, found five aggravating circumstances applicable and, despite Dr. Hord's expert mental mitigation testimony, concluded that Card had a sociopathic personality and failed to demonstrate any mitigating circumstances. The court further noted that even if Card had established the two statutory mitigating circumstances, they would have been outweighed by the weighty aggravating circumstances. On direct appeal, this Court quoted the following language from the sentencing order concerning Dr. Hord's testimony and affirmed the "reasoned judgment" of the trial court:

> The Court has taken into account the testimony of Dr. Hord and finds that the defendant is apparently a sociopathic personality. It is contended that this testimony establishes that the defendant was under extreme mental or emotional disturbance at the time of the commission of the offense and that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The Court finds, however, that the testimony of Dr. Hord does not establish any particular mitigating circumstance. Even if the Court determined that each mitigating factor raised by the [d]efendant had been established, that would not outweigh the overwhelming evidence of aggravating circumstances prevalent in the testimony.

*Card*, 453 So.2d at 24.

In addition to the record on direct appeal, there was also a complete record in Card's initial postconviction proceeding in 1986, which contained volumes of exhibits and reports from additional psychologists concerning his mental state. For example, Card's school

and juvenile court records from California and his extensive medical and psychiatric records from the military and the VA hospital were attached to his postconviction motion.

With a thorough review of the extensive record concerning Card's mental state, his background, his military experience, and his medical records, Whitton developed his mitigation strategy. Along with co-counsel, John O'Brien, Whitton hired a mitigation investigator, Pam Rogers, to assist in the resentencing. Based on a referral from Rogers, who had previously worked with him in California, an internet investigation into his credentials, and a review of an article he wrote, counsel hired Dr. Haney to assist with the mitigation investigation and presentation. Although Dr. Haney is an unlicensed psychology professor at the University of California and cannot treat or diagnose patients, he has a Ph.D. from Stanford and is a specialist in the area of psychology and legal issues. Specifically, Dr. Haney analyzes what psychological risk factors in an individual's social background and history can lead an individual to criminal behavior and indicate how well the individual will deal with incarceration. Whitton said he hired Dr. Haney "to help us with [Card's] family background and to explain to the jury how those background factors, Mr. Card's history of abuse, his school history, [and] various problems over the years" led to his current mental state and why he should be spared the death penalty. Dr. Haney visited Florida twice, once to investigate background facts and witnesses and interview Card and once to testify at the resentencing.

Counsel also hired an additional mental health expert, a clinical psychologist, Dr. McClaren, who conducted tests on Card and recommended neurological testing due to the possibility of brain damage. Counsel utilized Dr. McClaren's affidavit to seek additional neurological testing. The trial court approved the appointment of a third mental health expert, a neurologist named Dr. Elzawahry, who conducted an MRI and EEG to test for brain damage. However, counsel testified that all of the test results were normal and he never requested a *PET scan* because he did not believe he had sufficient supporting evidence.

Based on the results of this extensive investigation and Card's refusal to admit to the crime, counsel decided on a strategy to humanize Card to the jury. Unlike the first penalty phase, where the defense presented no lay witness testimony, Whitton decided to present the testimony of nine family members and friends, who testified about their relationship

with Card, his poor childhood and bizarre behavior, and his good nature. In addition, counsel decided to forgo additional expert testimony that he believed was inconclusive and inconsistent with his strategy to humanize Card. Importantly, counsel was aware that the use of a clinical psychiatrist at the first penalty phase resulted in testimony portraying Card as a sociopathic personality. Therefore, he limited his expert testimony to Dr. Haney, who studied Card's social history and background, reviewed his medical and military records, and interviewed Card and several of his family members. Dr. Haney testified about Card's background, such as poverty, instability, and abandonment, and described how those psychological risk factors tended to cause someone like Card to engage in criminal behavior and end up in prison. Dr. Haney also stated that Card has done extremely well in prison and would continue to do so if given the opportunity.

Card asserts that counsel's investigation and presentation was unreasonable because he hired an expert who was not competent to review Card's psychological and medical records and therefore failed to present testimony to support two statutory mitigators. Card's assertion that counsel was deficient in presenting the testimony of Dr. Haney is without merit for several reasons. First, although Card is correct that Dr. Haney is an unlicensed psychologist who cannot diagnose or treat, counsel's decision to hire Dr. Haney was a reasonable strategic one based on information of all available options. Counsel testified that he knew Dr. Haney was not a clinician, but specifically hired him at his mitigation investigator's suggestion because Dr. Haney was an expert in examining background, social history, and how prison life can affect individuals, both in terms of past prison experience and whether past experiences and childhood can lead to an inmate who does well in prison. Given that Card's history was well documented and he had been in prison for about nineteen years at the time of the resentencing, Dr. Haney's expertise was consistent with counsel's strategy to present testimony concerning his family background and his poor childhood and to humanize Card before the jury. The trial court's finding that Dr. Haney was competent to assist in the presentation of mitigation is supported by competent, substantial evidence.

Second, despite Card's assertions that no competent expert reviewed his records, the record confirms that Dr. Haney was not the only expert consulted during the resentencing. In fact, counsel met with several experts who had either previously evaluated Card or did so in preparation for the trial, including a clinical psychologist and a

neurologist. Based on the evaluations of Dr. McClaren, the normal results of the MRI and EEG conducted by Dr. Elzawahry, and his belief that the testimony of other experts was either too inconclusive or not credible, counsel decided his best strategy was to present Card's harsh background and abusive childhood without the label of *antisocial personality disorder* through the testimony of Dr. Haney and Card's family. Considering that counsel's decision was based on hours of investigation and a reasonable belief that he had no credible expert who could conclusively establish mental mitigation, his decision to present the testimony of Dr. Haney was reasonable under the circumstances.

Additionally, there is competent, substantial evidence to support the trial court's finding that the record did not support the presence of either extreme mental or emotional disturbance or the statutory age mitigator. As to the extreme disturbance mitigator, Dr. Mosman testified that Card had demonstrated bizarre behavior since he was young and was diagnosed as a schizophrenic personality between the ages of thirteen and sixteen, his military records show psychiatric evaluations, and Minnesota Multiphasic Personality Inventory ("MMPI") tests performed in 1981 and again in 1987 were consistent with schizophrenic type personality disorder. He also stated that Card's records, including the evaluations of two experts from the resentencing, indicated he had had *head injuries* and possible brain damage and that his IQ scores ranged from 83 in 1959, to 78 in 1961, to 96 in 1987.

However, as noted by the trial court, there was ample contradictory evidence in the record from experts who evaluated Card that he did not suffer from *schizophrenia*, but rather had *antisocial personality disorder*, and that the most recent test results confirmed that he had no brain damage. For example, Dr. Cartwright evaluated Card for competency to stand trial in 1981 and indicated that he was of average intelligence and demonstrated *antisocial personality disorder*. Dr. Wray also evaluated Card for competency and concluded that he had *antisocial personality disorder* and that there was no evidence of *schizophrenia* or extreme mental or emotional disturbance at the time of the crime. Although Dr. Mosman relied upon a 1986 report by Dr. Smith, which concluded that Card's symptoms were consistent with *schizophrenia* and recommended additional testing to rule out brain damage, that report was specifically generated to attack the competency investigation at the first penalty phase and was inconsistent with other tests indicating that Card had *antisocial*

*personality disorder*. Further, even Dr. Mosman admitted that the results of the most recent MRI and EEG conducted in 1999 were normal. Thus, there was sufficient evidence in the record to contradict Dr. Mosman's testimony that Card suffers from *schizophrenia* and has organic brain damage. Counsel is not rendered deficient for failing to present such testimony at the resentencing.

As to the statutory age mitigator, Card attacks Whitton for failing to understand the age mitigator and that emotional immaturity is a relevant factor to be considered. In this case, Card was thirty-four at the time of the murder, had received his GED degree and completed three and a half years of college, was at least of average intelligence (although he had received IQ scores as high as 130 to 135), and had taken care of his younger siblings and their children during his life. Therefore, the statutory age mitigator was clearly not applicable to Card and counsel cannot be deficient for failing to present evidence as to Card's alleged mental age. *See Troy v. State*, 948 So.2d 635, 652 (Fla.2006) (finding no abuse of discretion where trial court denied an instruction on the statutory age mitigator when the defendant was thirty-one at the time of the crimes and there was evidence that he worked, cared for his daughter, and functioned as a mature adult).

Essentially, Card's claim is that his counsel should have hired different experts and presented additional evidence.FN6 Notably, Card has not uncovered any additional mitigation witnesses or background records he asserts counsel should have discovered.FN7 This Court has repeatedly held that counsel's entire investigation and presentation will not be rendered deficient simply because a defendant has now found a more favorable expert. *See, e.g., Peede v. State*, 955 So.2d 480, 494 (Fla.2007). Counsel was faced with an inconclusive record on mitigation, so he fully investigated the records, hired several experts to assist in investigating mitigation, sought additional testing when recommended by the experts, and decided to forgo the presentation of certain expert testimony that he believed was inconclusive, not credible, or would make Card look like a "crazed killer" before the jury. Counsel's strategy was reasonable under the circumstances and certainly cannot be deemed constitutionally deficient as that term has been explained by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984), and its progeny, and consistently reiterated by this Court. *See, e.g., Occhicone v. State*, 768 So.2d 1037, 1048 (Fla.2000). Accordingly, we conclude that counsel conducted a reasonable investigation and made a reasonable strategic decision as to how to present the case for

**mitigation.FN8**

> **FN6. To the extent Card alleges that counsel was deficient because this was his first capital case and he lacked understanding of the statutory system, that claim is unsupported by the record and counsel's testimony as to his extensive preparation for the resentencing. Counsel also represented Card in his postconviction motion that successfully obtained a new penalty phase. Although counsel stated that the age mitigator is confusing, that does not render his entire performance deficient, especially where the statutory age mitigator was not supported by the record.**

> **FN7.  At the evidentiary hearing, Dr. Mosman testified that additional psychiatric records concerning two inpatient psychiatric hospitalizations for alleged self-inflicted wounds could have been obtained through proper research.  However, Card did not argue in his brief on appeal that counsel was ineffective for failing to uncover these records or that such records were not accessible to counsel or the experts he consulted during the resentencing.  In addition, even if counsel failed to locate these two hospital records, general information concerning these hospitalizations was found in other medical records contained in the record.**

> **FN8. Because we have concluded that counsel was not deficient, we do not address the prejudice prong of *Strickland. See Reaves v. State*, 942 So.2d 874, 881 (Fla.2006).**

*Card II*, 992 So.2d at 814-18.

2.      **Clearly Established Supreme Court Law**

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under *Strickland*, a habeas petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.*, 466 U.S. at 687.  It is the petitioner's burden to prove, by a preponderance of the

evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof. *Id.* If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

In determining whether counsel's performance was reasonable, the Court instructed:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574–1575, 71 L. Ed.2 d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana*, *supra*, 350 U.S. at 101, 76 S. Ct. at 164.

*Strickland*, 466 U.S. at 689. Regarding the prejudice prong of the *Strickland* standard, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Strickland*, 466 U.S. at 693. The Court has also clarified, however, that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. *Strickland*, 466 U.S. at 693–94. Instead,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. The prejudice assessment in this context does "not depend on the idiosyncrasies of the particular decisionmaker," as the court should presume that the

judge or jury acted according to law. *Strickland*, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695–96.

3.      Federal Review of Claim

The Florida Supreme Court cited *Strickland* as the legal standard applicable to claims of ineffective assistance of counsel and applied this standard to Petitioner's claim. *Card II*, 992 So.2d at 818. The state court, therefore, applied the correct legal rule based on Supreme Court precedent. Accordingly, the remaining issue is whether the state court's denial of Petitioner's claim resulted in an unreasonable application of *Strickland*.

The state court found that Petitioner's lead counsel, Jeffrey Whitton, conducted a thorough review of the extensive records available regarding Petitioner's background and was not deficient in either investigating or presenting mitigation evidence. *See Card II*. This court's review of the record amply supports the state court's conclusion. Mr. Whitton testified at the evidentiary hearing that in preparation for Petitioner's trial he reviewed the original trial proceedings and Petitioner's extensive mental health,

school and military records. Postconviction Record ("PCR") Volume I at 593-94; 604-10. In addition to a records review, Mr. Whitton interviewed family members and friends and several of the mental health practitioners utilized by the defense in prior proceedings. *Id.* at 594-97. He also hired a mitigation specialist (Pam Rogers), a psychologist (Dr. McClaren), a neurologist (Dr. Elzahary), and a risk factor analyst (Dr. Haney) in an attempt to develop additional mitigation.

Based on his review of the evidence, Mr. Whitton determined that the theme of his presentation in the penalty phase was to humanize Petitioner. *Id.* at 591. He explained that the "jury has got this preconception that they're dealing with Hannibal Lector and it's a monster and you have to humanize the defendant. But you then have to explain how these very human problems play together to create the person that [is] sitting in front of them." *Id.* at 591-92. Mr. Whitton chose to utilize Dr. Craig Haney, an unlicensed psychology professor from California who specialized in psychology and legal issues, who was recommended to him by his mitigation specialist, to present these factors to the jury. Dr. Haney's purpose was:

> to help us with his family background and to explain to the jury how those background factors, Mr. Card's history of abuse, his school history, various problems over the years, pretty exhaustive background check, the research that was done, all played together to create someone, not that a murder could be justified or excused, but that it could perhaps be understood for what it was and be seen as a more human act than the act of a monster that deserved to be put to death.

*Id.* at 592.

Regarding Petitioner's claim that Mr. Whitton should have presented evidence of the statutory mitigator of extreme emotional disturbance at the time of the crime, Mr. Whitton testified that he was unable to present evidence of the existence of this mitigator because his expert's opinions were inconclusive. *Id.* at 615. He had Dr. McClaren appointed to evaluate this factor, but the evidence he found was not strong enough to present. Dr. McClaren recommended that additional neurological tests be performed, so Mr. Whitton had Dr. Elzahary appointed to perform a MRI and various other tests. The results of these tests came back normal across the board. *Id.* at 599.

While Dr. McClaren also recommended hiring a neuropsychologist, Mr. Whitton explained why he did not try to obtain one as follows:

> So I had Dr. McClaren say, you need either a neurologist or a neuro-psych and you need to do a physical workup to see what there is. And would I have preferred one over the other, yes, but what I had the resources for was a neurologist that could do the preliminary scans, the MRI, the EKG, and if they had indicated anything further I could have come back to the Court and said, I think I need more resources. But I didn't get that first step and so I don't think I had any basis to come back to Court and ask for those additional, focused experts.

*Id*. at 617-18. Mr. Whitton testified that he did not have enough evidence to justify asking for a PET scan, and it was new technology at the time. *Id*. at 599.

With regard to whether Petitioner had any organic brain impairment, Mr. Whitton testified that he could not get any evidence to support this diagnosis. *Id*. at 597. Mr. Whitton testified that his memory was vague, but he believed that Dr. McClaren said that "he couldn't say anything within a reasonable degree of probability. He just couldn't, he didn't have the evidence. It was something to look for as a diagnostic tool but it wasn't conclusive." *Id*. Mr. Whitton testified that ultimately he did not use Dr. McClaren as a witness because his report also did not fit in with the theme of humanizing Petitioner. Mr. Whitton explained:

> It was going to make [Petitioner] look like he was a crazed killer in a way and I didn't, that was not the theme I was trying to present to the jury. And the evidence didn't back up, that I could get, didn't back up any kind of organic impairment. So I really couldn't use him to come and explain how the organic impairment could have caused anything. I just don't think I could have gotten that opinion admissible, didn't have any other evidence to back up the existence except, you know, his quote sensitivity to it. And it's my vague memory now that I've looked at the file and I hate to swear to this but it's a vague memory to me that Dr. McClaren said he couldn't say anything within a reasonable degree of probability. He just couldn't, he didn't have the evidence. It was something to look for as a diagnostic tool but it wasn't conclusive. So I couldn't, that is, didn't find enough value in his testimony to want to bring him and, again, it was a little bit inconsistent with the theme we had decided to present to the jury.

*Id*. at 596-97.

As part of his investigation into mental health mitigation, Mr. Whitton also interviewed several of the mental health practitioners who had been utilized in the first trial. He spoke with Dr. Hord, a clinical psychologist who was the only defense witness in the first trial. Mr. Whitton did not use Dr. Hord as a witness during the retrial because:

> I went back and I looked at his testimony and I looked at a subsequent report he did and it seemed to me that Dr. Hord was simply making up facts. He seemed to have a very poor understanding of the case, the history of the case, he assumed there had been a rape charge that had been brought and proven, which when I told him that just wasn't there, he said that doesn't make any difference to my diagnosis, I found that note, it doesn't make any difference to my opinion even though he had just spent ten minutes talking about how it all fit in. I just, you know, I didn't think Hord had a handle on what was going on, that was the first problem. The second one was he was coming up with, you know, again, the crazed killer approach, sociopathic personality and that wasn't the theme that I was trying to present to this jury of humanizing this man, bringing family members, explaining his background, explaining how that can lead to where you are. And so I just didn't think he would, if I were going to use anyone to bring in his psychiatric background it would have been Dr. McClaren as opposed to Dr. Hord.

*Id.* at 599-600. Mr. Whitton and Dr. Haney also traveled to Tallahassee to meet with Dr. Carbonell, a psychologist who had been utilized in Petitioner's previous federal habeas proceeding. *Id.* at 594. They met with her for several hours to review her notes and prior testimony. Their hope was to use her to support the appointment of a neuro-psychologist. However, they decided against using her as a witness for the following reason:

> Well, my memory of it is I walked out her front door, looked at Dr. Haney and said, is this woman completely crazy or what? And he didn't give me a professional diagnosis but by the time we had gotten all the way back to Panama City we were convinced that she would not survive cross-examination in any meaningful fashion. And she just display[ed] all sorts of nervous habits and changing topics in the middle of a conversation and it was, it was kind of a bizarre experience but I certainly didn't think she'd present well as a witness.

*Id.* at 595. Mr. Whitton, therefore, decided to use Dr. Haney as his expert witness to tie

in all of the various facets of Petitioner's background because he did not believe that he had any other conclusive or credible mental health testimony.

Further complicating matters, Petitioner maintained his innocence of the crime which made it difficult to present an emotional disturbance at the time of the crime mitigator. Mr. Whitton testified, "I don't see how you're going to get a lot of background that he committed under a certain circumstance when your defendant is telling you, I didn't do it. And I didn't have any kind of other information about him at the time that would have given me any basis to bring somebody that I can think of." *Id.* at 614. On examination by postconviction counsel Clyde Taylor, Mr. Whitton explained the decision to not have Petitioner testify:

> [Whitton]: Mr. Card has impulsivity problems and Mr. Card's conversations move and ramble. And it was and is my firm belief that if Mr. Card faced cross-examination by a skillful cross-examiner and Alton Paulk, the State Attorney, was a skillful cross-examiner, that he would ultimately just simply explode on the stand and would have displayed just exactly the opposite of this kind and sympathetic humanizing behavior that I was trying to present to this jury.
>
> [Taylor]: And did you discuss this with Mr. Card?
>
> [Whitton]: Yes.
>
> [Taylor]: And did he tell you that he wanted to testify or that he could testify or that he had a story to tell?
>
> [Whitton]: He told that he did, that he didn't. That he could, he couldn't. That he didn't, it would change on a regular basis. The final conclusion when it was, this is it, we can't, we don't have any more time to delay, was he accepted our recommendation that he avoid the stand.

*Id.* at 611-12.

With regard to the statutory age mitigator which Petitioner argues should have been presented during the penalty phase, Mr. Whitton testified that "there were some hints that he showed signs of immaturity, he was slow in maturing," but there was nothing that showed that he was emotionally immature at the time of the offense. *Id.* at 619-20. Additionally, he was chronologically around 35 years old at the time, and Mr.

Whitton did not recall any support in Dr. Hord's evaluations to argue the age mitigator. *Id*.

In addition to Dr. Haney, Mr. Whitton presented several of Petitioner's family members and friends to give the jury information regarding his background and difficult childhood as well as his good adjustment to prison. With regard to utilizing Petitioner's family members as witnesses on his behalf, Mr. Whitton stated that the family was difficult to deal with in general. *Id*. at 607. Mr. Whitton explained, "[w]ell, you've heard the expression herding cats. This family was a lot like that. They're all strong, they're all brittle personalities. The brother certainly also, I mean he fell off the wagon, he had been sober for some time prior to this hearing, that didn't last through the process, we had to find him on Beach Drive One, during the trial." Mr. Whitton continued,

> They were strong-willed and they didn't necessarily do everything I asked but we spent a lot of time and Mr. Rogers spent even more time and Ms. Husbands, my paralegal spent a lot of time trying to keep these witnesses, answer every question these witnesses had, get them prepared, get all the story we could out of them. I spent a lot of time with them, we put a lot of effort into it.

*Id*. at 608.

The penalty phase record shows that Mr. Whitton had the following witnesses testify to Petitioner's childhood and background: his mother, brother-in-law, sister, daughter, ex-wife, uncle, brother and a friend. *See* Penalty Phase Trial ("P") XXIX 20-56; XXX 4-60; XXXI 5-25. These witnesses testified about a history of extreme poverty and instability, abandonment by Petitioner's biological father, an abusive stepfather, problems in school and issues with self-inflicted injuries. Additionally, Mr. Whitton presented the testimony of the priest who ministered to Petitioner on death row, the director of Catholic Charities in St. Augustine who had developed a relationship with Petitioner and a Catholic sister with whom Petitioner maintained contact. These witnesses were used to help paint a picture of the type of man Petitioner had become in the years since the crime, including his interest in religion and art. *See id*.

The penalty phase trial record demonstrates that Dr. Haney was the last witness to testify and that he utilized the previous testimony of family and friends to present a list of risk factors which he explained to the jury contributed to Petitioner's development, including moderate to severe poverty, severe abandonment, moderate instability, severe neglect, and quite severe emotional and physical abuse. *See* P. Vol. XXXI at 38-68. Dr. Haney opined that these risk factors contributed to Petitioner's poor sense of self and low self-esteem, his misbehavior and poor impulse control, his delinquency and problems in school and his substance abuse issues. *See id.* Dr. Haney also addressed Petitioner's positive adjustment to prison, including his interest in art, religion and law. *Id.* at 68-83.

The Florida Supreme determined that Mr. Whitton's performance was reasonable under the circumstances. The state court found that "[c]ounsel was faced with an inconclusive record on mitigation, so he fully investigated the records, hired several experts to assist in investigating mitigation, sought additional testing when recommended by the experts, and decided to forgo the presentation of certain expert testimony that he believed was inconclusive, not credible, or would make Card look like a "crazed killer" before the jury." *Card II*, 992 So. 2d at 818. This determination is reasonable in light of the record in this case.

Petitioner's collateral counsel produced one witness at the evidentiary hearing, Dr. Bill Mosman, a forensic psychologist and attorney. Dr. Mosman was unable to interview Petitioner because Petitioner would not agree to meet with him. PCR Vol. I at 526. He did, however, review numerous documents and the entire second penalty phase proceeding. *Id.* at 528. Dr. Mosman opined that there was "ample data" indicating that Petitioner was suffering from extreme mental or emotional disturbance at the time of the crime. *Id.* at 535. He based this determination on various affidavits from friends and family indicating that Petitioner behaved bizarrely and was in need psychiatric help, as well as probation records from California indicating that Petitioner was diagnosed as a schizophrenic when he was between 13 and 16 years old. *Id.* at 538. Dr. Mosman also relied on Petitioner's miliary medical records and Dr. Hord's and

Dr. Carbonell's previous reports indicating that Petitioner had a schizophrenic-type personality. *Id.* at 542. Dr. Mosman testified there "is a long history of when there's a lot of stress going on he, meaning, Mr. Card, decompensates and becomes a danger to self, danger to others, these types of acting out episodes and that, that's consistent throughout his history." *Id.* at 543.

Dr. Mosman also believed that the records indicated that Petitioner had suffered brain damage as a result of several head injuries when he was young. *Id.* at 544. Dr. Mosman opined that Dr. Carbonell's test results supported his belief that Petitioner had brain damage. *Id.* at 548. He also noted Dr. McClaren's findings that there were areas that were suspicious of brain damage; however, Dr. Mosman did acknowledge that subsequent EEG and MRI testing was within normal limits, although he does not believe these tests are proof-positive. *Id.* Dr. Mosman also touched on Petitioner's IQ and stated, "I'm not saying he's retarded, I'm saying there's a mental deficit and disturbance. . . ." and that his IQ of 78 in 1961 would be considered mentally retarded by today's standards. *Id.* at 552. He did note that Dr. Carbonell determined Petitioner's full scale IQ to be 96, but testified that the figure is probably more accurately 86. Dr. Mosman testified that Dr. Haney by his own admission was not qualified to interpret the data or diagnose Petitioner's mental state. He testified that the data was available at the time of the retrial of the penalty phase, but no one with the proper expertise was utilized by the defense. *Id.* at 554.

Dr. Mosman also testified that based on his review of the records Petitioner was emotionally and socially immature. However, he did not state specifically what mental age he believed Petitioner to be at the time of the crime. *See id.* at 560-62. Finally, Dr. Mosman testified about the nonstatutory mitigating evidence he believed existed but was not brought out by the defense at the penalty phase trial, including the ability to be rehabilitated, good prison behavior, the disadvantage of a deprived childhood (as opposed to an abusive childhood), emotional impairment, the mother's alcoholism, other medical problems including an atrophied sciatic nerve, other charitable or humanitarian deeds, remorse, alcohol and drug use, and the issue of brain damage.

*See id.* at 564-67.

On cross-examination, Dr. Mosman stated that he was unable to speak with either Dr. Carbonell or Dr. McClaren and relied on their affidavits and test results when forming his own opinion about the data. Dr. Mosman also rejected the efficacy of Dr. Haney's risk factor analysis because it does not explain why Petitioner behaved criminally when his siblings did not. Dr. Mosman testified, "[t]hat's why risk factors in a death penalty case are frankly from my clinical opinion, worthless. Because it doesn't answer the question. All that answers the question when you have a risk factor is you should have a higher probability of having problems but so what, you've got other siblings that didn't. It doesn't go to the heart of an individualized, particularized description of the history, character, and record and the crime of the individual under scrutiny." *Id.* at 581-82. Assistant State Attorney Joseph Grammer brought out on cross-examination, however, that many of the items of mitigating evidence that Dr. Mosman felt should have been presented at the retrial would have necessitated putting information before the jury that might not have been favorable, *e.g.*, evidence that Petitioner was schizophrenic. *See id.* at 583-86.

The postconviction court did not find Dr. Mosman's testimony regarding the existence of the statutory mitigators persuasive and, indeed, found that the record did not support the contention that the extreme emotional disturbance mitigator was present. Order Denying Motion for Postconviction Relief, PCR Vol. III at 424. The court found with regard to a neurological disorder or head injury that there was information refuting this assertion in the record. Specifically, the court stated, "Dr. Mosman cited affidavits submitted by Dr. Haney and Dr. McClaren; however, these affidavits simply stated that brain damage was possible and asked for more time to conduct additional testing." *Id.* The court also noted that the record contained evidence that Petitioner did not suffer from schizophrenia, but rather an antisocial personality disorder. The court stated:

> This information would not have helped Defendant, as the Courts have held that there is a significant difference between a mental disease and a

**mental disorder. *Patton v. State*, 878 So.2d 368, 375-76 (Fla. 2004)(collecting cases); *see also Elledge v. State*, 706 So.2d 1340, 1346 (Fla. 2007)(affirming death sentence where trial court denied statutory mental health mitigator based on the expert testimony that defendant had antisocial personality disorder and found that such disorder is not a mental illness, but a life long history of a person who makes bad choices in life, and that these choices are conscious and volitional).**

*Id.* at 424-25. Additionally, the postconviction court found that Petitioner did not establish that Mr. Whitton was ineffective in his investigation into possible mental health mitigation. The court further noted that while Dr. Mosman felt that early IQ scores, of 83 and 78, might support a diagnosis of mental retardation by today's standards, Petitioner's medical records contained evidence of higher IQ scores, 92 and 96, and he completed a G.E.D. and had several years of college courses while incarcerated in California. Additionally, Petitioner never before made a mental retardation claim. *Id.* Finally, with regard to the statutory age mitigator, the postconviction court found while Dr. Mosman opined that Petitioner was socially, emotionally and intellectually immature, Petitioner was 34 years old at the time of the homicide, had an average IQ, had completed a GED and three and one-half years of college and suffered from no neurological problems. Further, Dr. Mosman did not testify as to what he believed Petitioner's mental age was at the time of the crime. The Florida Supreme Court found that the record supported the postconviction court's findings.

*Strickland* cautions that "strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690-91. The *Strickland* test requires a court to determine whether counsel's strategic decision was "reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed.2d 985 (2000). Similarly, deciding the reasonableness of counsel's actions is not viewed through the lens of twenty-twenty hindsight. *Strickland*, 466 U.S. at 690. In a federal habeas corpus proceeding, this court's duty, is to "to determine whether the state habeas court was objectively reasonable in its *Strickland* inquiry," not to independently determine the reasonableness of counsel's actions. *Putnam v. Head*, 268

**F.3d 1223, 1244, n. 17 (11th Cir. 2001).**

In this case Mr. Whitton made a thorough investigation into possible mitigating evidence. As noted earlier, he reviewed the original trial proceedings and all available background records, located family members and friends who testified on Petitioner's behalf, and hired a mitigation specialist and various mental health professionals to evaluate Petitioner and perform testing in an effort to establish mitigating evidence. These investigative steps were more than adequate to constitute effective assistance of counsel. Notably, Petitioner has not pointed to additional investigative steps Mr. Whitton should have taken. This exhaustive investigation informed Mr. Whitton's penalty phase strategy of humanizing Petitioner, which was reasonable under the circumstances. Importantly, postconviction counsel was only able to produce one witness at the evidentiary hearing (Dr. Mosman) to support the statutory mitigators he now contends existed at the time of the retrial, and the state court found Dr. Mosman's testimony unpersuasive in establishing either statutory mitigating factor. Given the record in this case, the state court's determination that Mr. Whitton's performance was not deficient is consistent with established Supreme Court precedent.

Finally, Petitioner's attempt to analogize his situation to that of the petitioner in *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed.2d 360 (2005), is unavailing. In *Rompilla*, the Court found that Rompilla's counsel's failure to examine a readily available file on his prior conviction for rape and assault at the sentencing phase of his capital murder trial fell below the level of reasonable performance where counsel was on notice that this prior conviction was similar to the current charge and would be used as a source of aggravation by the prosecution. While there may be factual aspects of Rompilla's childhood that appear similar to Petitioner's,[6] the important

---

[6] Judge Sloviter in *Rompilla v. Horn*, 355 F.3d 233, 279 (3d Cir. 2004)(dissenting opinion) (citations omitted), summarized some of the disturbing facts of Rompilla's background as follows:

> Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating

distinction is that in Rompilla's case none of this evidence was presented to his jury. In contrast, Petitioner's jury heard evidence from numerous witnesses about many elements of Petitioner's difficult childhood and still recommended the death penalty by a vote of eleven to one.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence, and Petitioner has not done so. Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to that established by United States Supreme Court precedent or in an objectively unreasonable manner in light of such precedent. Therefore, Petitioner is not entitled to habeas relief on this ground.

## V. CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. § 2254 11(b).

The court finds no substantial showing of the denial of a constitutional right in this case. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-

---

on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags.

The Supreme Court quoted these facts and noted, "[t]he jury never heard any of this and neither did the mental health experts who examined Rompilla before trial." *Rompilla v. Beard*, 545 U.S. 374, 391-92, 125 S. Ct. 2456, 162 L. Ed.2d 360 (2005).

04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, no certificate of appealability is issued herewith.  If either party objects to this denial, that party may file a motion for reconsideration of the denial; however, a motion to reconsider such denial does not extend the time to appeal.  § 2254 11(a).

## VI. CONCLUSION

For the foregoing reasons, the petition for issuance of a writ of habeas corpus (doc. 1) is DENIED.  Additionally, no certificate of appealability will issue.

DONE and ORDERED this 23rd day of November, 2010.

_s/ Stephan P. Mickle_

**Stephan P. Mickle**
**Chief United States District Judge**